FILED
2010 Oct-14 AM 10:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

LEON HOUSTON EMBRY, )
)
    Plaintiff, )
)
vs. ) CIVIL ACTION NUMBER
)
CITY OF LEEDS, ALABAMA, ) 83-C-2375-S
)
    Defendant. )

FILED
JUN 30 1986
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA



ENTERED
JUN 30 1986

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this Title VII action, 42 U.S.C. §2000e *et seq.*, plaintiff Leon Embry claims that he was subjected to discriminatory treatment and eventually discharged by the defendant City of Leeds, Alabama, because of his race. Based on the following Findings of Fact and Conclusions of Law, plaintiff has carried his ultimate burden of proving that he was a victim of racial discrimination; he is therefore entitled to the appropriate relief.

I.

1. Plaintiff is a black male citizen of the United States. He timely commenced this action.

2. In October, 1982 the defendant City of Leeds issued a job announcement for two vacancies in the position of

3

Firefighter I. The qualifications listed by defendant for the job were as follows:

> Some knowledge of street system and physical layout of the City of Leeds. Ability to learn a wide variety of firefighting duties and methods. Physical strength and ability and freedom from serious physical defects as indicated by a physical examination and performance tests. Applicant must meet age and other applicable limitation as set forth in the State of Alabama firefighter standards, and must pass EMT [Emergency Medical Technician] basic requirement course as prescribed by State of Alabama.

3. Plaintiff applied for one of the vacancies; and of the three persons considered for the three vacancies, he was clearly the best qualified.

4. Plaintiff is a high school graduate, and he served honorably in the United States Army. He completed the established courses of instruction for Intermediate and Advanced Medical Technician offered by the University of Alabama in Birmingham. In 1979, he earned an Associate of Applied Science degree from Lawson State Community College. From November 1977 until March 1982 plaintiff worked as a paramedic for Hank's Ambulance Service.

5. In his interview with the defendant's Fire Chief, plaintiff was told that he was competing with another black applicant for one of the two vacancies. The Fire Chief

2

also indicated to plaintiff that he resented being pressured by a political group into hiring a black firefighter. He told plaintiff that he [plaintiff] should not perform emergency medical procedures on white women; and that plaintiff should not "fool around" with white women in Leeds.

6. Plaintiff was hired by the defendant as its first black firefighter on November 17, 1982.

7. Jeff Little, a white applicant, was selected for the second vacancy.

8. The regular shift of a Firefighter I in Leeds involves 24 hours on duty and 48 hours off duty, for a total of 56 hours per week.

9. Plaintiff was assigned a special shift of 12 hours per day for five days of the week; Little was given the regular shift of a Firefighter I. Plaintiff was the only firefighter assigned to a special shift.

10. During his tenure of employment with the City of Leeds, plaintiff adequately and satisfactorily performed all of his job duties and functiions. There was never any written or verbal complaint concerning the quality of his job performance.

11. On one occasion in January, 1983, plaintiff was late for work. The weather conditions had closed most of the major thoroughfares in the county on that date; and because of the weather conditions, plaintiff was an hour late for work.

3

When he arrived, the Fire Chief stated that he had not expected to see plaintiff at all that day; and that he (the Fire Chief) had remained there only because of the adverse weather conditions. Plaintiff was not counseled or reprimanded because of his tardiness on that day; and he was never tardy again. [1] According to the City's Personnel Director, tardiness slips are routinely sent to his office. He never received any slip or notice indicating that plaintiff was tardy.

12. During plaintiff's tenure of employment with defendant, his acting supervisor, Johnny Denson, constantly used racial epithets in his presence and directed them at plaintiff. On one occasion, Denson said that he did not want to sleep in the same room with a "nigger." On another occasion, when Denson's sick mother was about to be transported to the hospital by a crew of which plaintiff and Denson were members, Denson said that "he didn't want no

---

[1] The Court expressly discredits Defendant's Exhibits ("DX") 16 and 17. Tardiness should be reported in the Station Log Book, DX 38. The court finds that the entry "Embry Late For Duty. 15 min" on the log for January 27, 1983, was not made contemporaneously with the surrounding entries. The Court does not credit Denson's testimony that plaintiff was late on that date.

Contrary to DX 17, the Station Log Book reflects that Embry did, in fact, timely report to work at his scheduled hour on February 10, 1983.

4

nigger in the back [of the ambulance] with his mother." Commander David Coursan heard this statement; and plaintiff duly reported the incident to Coursan and another fulltime commander. Although the Fire Chief was aware of Denson's use of racial epithets and of his persistence in using them, neither he nor anyone else ever took any corrective action against Denson.

13. Plaintiff was discharged on March 29, 1983.

14. Plaintiff was ultimately replaced by a white firefighter Rodney Scott Fulmer.

15. Plaintiff has made out a prima facie case that he was discharged because of his race.

## II.

16. The defendant has articulated four reasons for plaintiff's discharge: (a) that he "possibly falsified his employment application, (b) that he was arrested for public intoxication on February 8, 1983, (c) that he was twice tardy without excuse while still a probationary employee, and (d) that his "conduct did not meet the standards of performance required for probationary employees as set forth in the City of Leeds, Alabama Fire Department Rules and Duty Manual, and the City of Leeds, Alabama Personnel Rules and Regulations."

III.

17. The employment applicatiion contained, among other things, the following inquiry: "List any trades, professional certificates, licenses, patents received, professional job recognition, or other such qualification." In response, plaintiff listed "E.M.T. Paramedic", among others. There is no doubt, and defendant was well aware, that from 1977 until March 3, 1982, plaintiff had worked at Hank's Ambulance as an E.M.T. paramedic.

18. The job description for the vacancy filled by plaintiff does not indicate that a qualified applicant must be a currently licensed paramedic.

19. In February, 1983, plaintiff was notified by the State Department of Public Health ("the Department") that his EMT License was cancelled because of his alleged failure to earn the requisite continuing education credits. If the matter had not been corrected, under the rules of the Department, plaintiff would have been required to surrender his license. DX 23, p. 10. However, plaintiff immediately contacted his supervisor at Hank's Ambulance. The supervisor contacted the Department; and on the following day, he informed plaintiff that the problem had been corrected, and that his license remained current. Hank's Ambulance had a strict policy requiring that the licenses of all its paramedics be kept current. After receiving this information

6

from Hank's, and with no demand for his license by the Department, plaintiff in good faith believed that his license was current. The court finds that they were in fact current.

20. In December 1982, the Fire Chief asked plaintiff if he knew that his paramedic license had been cancelled. Plaintiff answered in the negative. The Fire Chief assured plaintiff that he had checked with the Department, and that the license was cancelled. On that same day, the Chief called the Department, and again, plaintiff's license was reinstated on the same date. DX 11.

21. The continuing education requirement for paramedics was in its embryonic stages in 1982-83. This explains the failure of various institutions to report courses which plaintiff had completed in 1981, and the relative ease with which both the Hanks supervisor and the defendant's Fire Chief obtained a reinstatement of plaintiff's license.

22. During the period of plaintiff's employment with the defendant, there were no drug boxes on the city's ambulances; and the only function which a non-license paramedic could not perform was that of administering drugs.

23. There was never any disruption in the operation of the defendant's Fire Department because of the alleged cancellation of plaintiff's paramedic license.

24. At no time contemporaneous with its alleged discovery of plaintiff's alleged falsification of his

employment application did the defendant consider any oral or written disciplinary action against plaintiff. Quite to the contrary, the Fire Chief said that it was not plaintiff's fault that his license had been cancelled.

25. The plaintiff has carried his burden of proving that his alleged falsification of his employment application was a pretext for discrimination.

26. On February 8, 1983, plaintiff was arrested for public intoxication at University Hospital in Birmingham, Alabama. In his arrest report, Officer Markem's narrative reads as follows:

> Officer received a call on a black male located in university hospital harrassing employees. Suspect matching the description was located. During the questioning of this suspect, Def. Houston Leon Embry, Jr. walked up to the office questioning suspect Adams. Def was unsteady on his feet, smelled strongly of an alcoholic beverage and was abusive in his speech. Def. was arrested for public intoxication.

27. Plaintiff later pled guilty to the charge of loitering; and the charge of public intoxication was dismissed.

28. After learning that plaintiff had been arrested for public intoxication, the defendant caused its Sgt. C. A. Hudson to "investigate" the charge, for the basic purpose of verifying that plaintiff had been charged with public intoxication.

8

29. Although it is the policy of the defendant to give an employee a chance to exlain his version of an incident which may result in discharge, plaintiff was never given an opportunity to explain his version of the incident which led to his arrest for public intoxication.

30. In the opinion of the Personnel Director, plaintiff would have been discharged for the arrest even if he had been a non-probationary employee.

31. If the defendant had followed its policy of fully investigating an incident prior to the discharge of an employee, it would have ascertained plaintiff's explanation of the events leading to his arrest. If it had heard and investigated plaintiff's version of the incident, and if the fact of race had not tainted its decision, a preponderance of the evidence convinces the Court that the defendant would not have discharged the plaintiff.

32. If the defendant had entertained a good faith belief that plaintiff was in fact intoxicated on the occasion which gave rise to his arrest, it would have articulated public intoxication, rather than "arrest for public intoxication", as a ground for his discharge. Plaintiff's race was the motivating factor in the decision to discharge him, and in the decision not to reinstate him.

33. In 1981, a controlled substance - a quaalude pill - was found in the truck of a white firefighter, Luther

9

Willis. Although Willis had a series of disciplinary warnings and suspensions in his file, and the fire chief recommended that he be fired for this possibly felonious conduct, Mayor Courson was content to "just warn [Willis] not to let it happen again."

34. On August 8, 1980, a white employee, Melvin Norwood, was suspended for five days for "purchase and consumption of Alcoholic Beverage while on official duty Thursday Aug. 7. 1980."

35. Another white employee, Jimmy Lee Kerr, came to work under the influence of alcohol on four separate occasions between 1981-1984. His most recent such offense resulted in his most serious punishment to date, a 15-day suspension.

36. Jimmy Marvin Latham, another white employee, has operated city equipment on two separate occasions while under the influence of alcohol. Since the last time he operated city equipment while under the influence of alcohol, he has been suspended for one week for intoxication.

37. White firemen, including Denson, sometimes reported for duty while intoxicated. None were ever discharged for this offense.

38. Plaintiff's supervisors were well-pleased with the quality of plaintiff's job performance.

39. Even if plaintiff had been found innocent of

10

all charges, arising out of the February 8 incident, including that of loitering, the defendant's Fire Chief, according to his own testimony nonetheless would have discharged plaintiff without affording him an opportunity to be heard prior to the discharge.

40. Based in substantial part on the court's assessment of the credibility of defendant's witnesses together with the different treatment of white employees involved in incidents of public intoxication, the court concludes that the defendant's use of plaintiff's arrest as a ground for discharge was a pretext for discrimination.

41. Other than plaintiff's alleged tardiness, alleged "possible falsification of his employment application, arrest for public intoxication, the defendant articulates as an additional reason for plaintiff's discharge that his "conduct did not meet the standard of performance required for probationary employees as set forth in the City of Leeds, Alabama Fire Department Rules and Duty Manual and the City of Leeds, Alabama Personnel Rules and Regulations." Pretrial Order, p. 4, paragraph 5(c).

42. The defendants' Personnel Rules and Regulations, DX 22, state, with respect to the termination of probationary employees:

11

> If at any time during the probationary period the supervisor, or department head, determines that the services of the employee have been unsatisfactory, the employee may be terminated from his position.

DX 22, p. 6.

43. There is no evidence that during plaintiff's tenure of employment with the defendant, his services were unsatisfactory.

44. The "Rules and Duty Manual" of the defendant's Fire Department, DX 24, provides that firemen, among other things, "... shall not indulge in the use of or be under the influence of these intoxicants <u>while in uniform</u> off duty." Id., P. 23 §10-8. Plaintiff was not in uniform on February 8, 1983.

45. Section 10-12 of the Rules and Duty Manual provides that

> No member of the department shall at anytime be guilty of any act or omission which impedes, injures, or hinders the progress, welfare, efficiency, or good name of the department and the commission of any act involving moral turpitude, dishonesty, or corruption by a member of the department, whether the same be committed in the course of his relations as a member of the department or otherwise and whether the same shall constitute a felony or misdemeanor or not....

46. To the extent that the defendant relies on the

Personnel Rules and Regulations and/or the Rules and Duty Manual, the evidence establishes that the reliance thereon is a pretext for discrimination.

IV.

47. Following his discharge, plaintiff diligently sougt interim employment. He mitigated his damages by $14,320.

48. Had plaintiff not been unlawfully discharged, he would have earned $47,804.00 between the date of his discharge and the date of trial.

49. Plaintiff is entitled to prejudgment interest, computed at NLRB rates.

50. Plaintiff is entitled to recover of defendant $41,897 in backpay.

51. Plaintiff is entitled to reinstatement, attorney's fees and costs.

Based on these Findings and Conclusions, by separate order, judgment shall be entered in favor of plaintiff and against defendant.

DONE this 30th day of June, 1986.

A TRUE COPY
GENE W. BELL, ACTING CLERK
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
BY
DEPUTY CLERK

UNITED STATES DISTRICT JUDGE
U. W. CLEMON

13